2022 IL App (1st) 210456-U

SECOND DIVISION
May 31, 2022

No. 1-21-0456

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re*: | ) | Appeal from the |
| | ) | Circuit Court of |
| D.M., Y.M., and J.M., Minors, | ) | Cook County. |
| | ) | |
| Appellees | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 15 JA 1290 |
| | ) | No. 15 JA 1291 |
| v. | ) | No. 15 JA 1292 |
| | ) | |
| A. M., | ) | Honorable |
| | ) | Jennifer Payne, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE HOWSE delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

ORDER

¶ 1    *Held*:   The judgment of the circuit court of Cook County is affirmed; the trial court's judgment that it is in the best interest of the minor children to terminate respondent's parental rights is not against the manifest weight of the evidence.

¶ 2    The State filed a petition for adjudication of wardship of D.M., J.M., and Y.M., minors. A.M., the minors' mother, is the respondent to the petition. Following a hearing, the trial court entered a judgment terminating respondent's parental rights to all three minors and authorizing the Illinois Department of Children and Family Services (DCFS) to place the children for

adoption. Respondent appeals, arguing the trial court's judgment is against the manifest weight of the evidence.

¶ 3     For the following reasons, we affirm.

¶ 4                              BACKGROUND

¶ 5     In December 2015, the State filed petitions for adjudication of wardship of D.M., J.M., and Y.M. (minors) naming respondent, A.M., as their mother. The petitions alleged that under the Juvenile Court Act the minors were neglected in that they were not receiving the proper or necessary support, education, medical or remedial care or other care necessary for their well-being and that the minors were abused in that their environment creates a substantial risk of injury by other than accidental means. The State supported its petitions with an affidavit documenting efforts by DCFS to provide services to A.M. to prevent placement of A.M.'s children.

¶ 6     In December 2016 the trial court entered an order stating that the "permanency goal" for the children was for them to return home within 12 months. On February 10, 2017, the trial court entered an order on the petitions for adjudication of wardship finding the minors abused or neglected under the Juvenile Court Act for lack of care, injurious environment, lack of supervision for an unreasonable period of time and a substantial risk of physical injury. The court set the matter for a dispositional hearing.

¶ 7     On February 21, 2017, the trial court entered a permanency order finding that A.M. had not made substantial progress toward the return home of the minors but that she had recently begun making minimal progress. The order stated that the permanency goal could not be immediately achieved because services are ongoing.

¶ 8    On February 21, 2017 the trial court entered a dispositional order finding A.M. unable, for some reason other than financial circumstances, to care for the minors and adjudging the minors wards of the court. The order found that reasonable efforts had been made to prevent or eliminate the need for removal of the minors from the home and that services aimed at family preservation and family reunification had been unsuccessful. The court terminated the temporary custody of the minors, placed the minors in the guardianship of DCFS with the right to place the minors, and set the matter for a permanency planning hearing.

¶ 9    On August 29, 2017, the trial court entered a permanency order for the minors. The August 2017 permanency order sets the permanency goal to return home pending a status hearing. The court found A.M. had not made substantial progress and she is "unstable with housing and visitation."

¶ 10    On January 31, 2018, the State filed a "Permanency Planning Hearing Report to the Court." A.M.'s caseworker prepared the report and stated, in part, that A.M. had "made minimal progress in the recommended services over the past 6 months." The report stated A.M. had been regularly engaging in individual therapy but that since A.M. moved to Indiana at the end of December 2017 "there has been a lack of scheduling and communication between [A.M.] and the therapist to get a regular day scheduled." The report noted that A.M. "went weeks without getting back to her therapist to schedule a session," but the individual therapy "is vital for [A.M.] to engage in to advance her progress in reunification and her underlying struggles." The report stated A.M. moved into stable housing on December 28, 2017, and A.M. reported that she was employed at Horseshoe Casino in Hammond, Indiana. The report recommended a permanency goal of substitute care pending a determination on the termination of A.M.'s parental rights. The report stated this recommendation was made due to A.M. "making very minimal progress over

the last 6 months." The report stated A.M. "has not been making progress in individual therapy, has only been employed for less than 30 days, has obtained housing for less than 30 days, and has not been compliant with her mental health monitoring." The report also stated that all three minors "have a great fear of returning with their mom due to her ongoing instability."

¶ 11     The record contains a detailed "Family Service Plan" that states the history of A.M.'s interaction with the State including the conditions that led to DCFS involvement and the efforts made to create the conditions necessary for A.M. to retain custody of the minors. The record also includes reports by various service providers to A.M., including Volunteers of America in Chicago, Crown Counseling Services in Crown Point, Indiana, Heartland Health Outreach in Chicago, and Howard Counseling Services, Inc., that detail A.M.'s progress with those services.

¶ 12     On January 31, 2018, the trial court entered a permanency order with a goal of "return home within 12 months." The order stated respondent had not made substantial progress towards the return home of the minors and that she "needs to make progress in individual therapy," but A.M. "has stable housing and a job."

¶ 13     On May 7, 2018, the State filed a "Permanency Hearing Report." The May 2018 Permanency Hearing Report stated A.M. had made "some" progress in the recommended services over the past eight months. A.M. started parent coaching in December 2017 and as a result supervised visitation was increased from biweekly to weekly. The report also stated that A.M. had been consistent in attending visits and did not miss any since January 2018. However, the report stated that A.M. had not attended individual therapy from December 2017 until March 8, 2018, due to scheduling difficulties. A.M. misinformed her therapy provider that their proposed appointment conflicted with her scheduled visitation. A.M. insisted on switching therapists despite being told another therapist was unavailable. A.M.'s desired therapist was

scheduled but A.M. missed her first two sessions with the new therapist. A.M. then rescheduled and attended five sessions, but A.M. informed her case worker that she was again going to obtain a new therapist herself.

¶ 14    A.M. successfully completed parenting classes in August 2016, completed 13 sessions of parent coaching, had stable housing, and was employed. The report recommended a permanency goal to have D.M., J.M., and Y.M. return home within 12 months.

¶ 15    Attached to the Permanency Hearing Report was a "Family Service Plan" by DCFS detailing services to A.M. and her participation and progress therewith which is supported by detailed reports by various service providers detailing A.M.'s participation in their services. The record also contains a March 26, 2018 report by Volunteers of America (VOA) titled "Parent Coaching – Summary of Progress" report. The VOA report listed several goals. The report concluded respondent did not fully reach the first goal as a result of "demonstrating inappropriate communication towards her children during heightened situations, displaying an inability to diffuse situations and setting a negative example relating to communicative responses for her children." The report stated that A.M. showed progress with the second goal "by abstaining from the use of corporal punishment and implementing learned techniques toward obtaining desired behaviors." However, regarding the second goal the report concluded A.M. "did not display a high level of consistency with implementing consistent rules, regulations, guidelines, and consequences," therefore preventing A.M. from fully reaching that goal. Finally, the report concluded A.M. did not meet the third goal because A.M. "struggles to appropriately cope with triggers."

¶ 16    Additionally, Howard Counseling Services, Inc. provided a progress report through March 11, 2018, for each minor. The report concluded that D.M.'s progress in therapy was good;

Y.M. "has made some progress in achieving his goals" and Y.M. told the therapist that he wants to remain in the home with his foster parents who he calls mom and dad; and J.M.'s progress in therapy was good.

¶ 17     In May 2018 the trial court entered a permanency order finding A.M. had made some progress toward the return of the minor children. The order set a goal to return the children home in 12 months and continued the matter for a permanency hearing.

¶ 18     On February 28, 2019, the trial court entered a permanency order setting a goal of substitute care pending a court determination on termination of parental rights. The order stated the change in goal was due to A.M.'s lack of progress. Also on February 28, 2019, the State filed a "Parenting Capacity Assessment" prepared at the request of VOA. The detailed report documents A.M.'s personal, psychiatric, and personal history; multiple interactions between A.M. and the minors, and observations about them. The report concludes that A.M. should continue to receive psychiatric oversight, should follow all DCFS recommendations and guidelines, and could benefit from Parent-Child Interaction Therapy.

¶ 19     The State also filed a "Permanency Planning Hearing Report to the Court" and a "Parent Coaching Report." The hearing report recommended a permanency goal of return home within five months for the minors "with continued individual therapy for [A.M.] as she has been progressing and engaged." The coaching report concludes that A.M. "needs continued assistance in creating more structure and consistency in her visits." She "often becomes overwhelmed by the behaviors of all of her children." A.M. had not adopted the interventions suggested by the parent coach to result in meaningful changes in A.M.'s parenting. The report stated: "At this time it is not clear if additional parent coaching will ultimately have an effect on [A.M.'s] deeply engrained parenting style." A.M. informed the service provider that A.M. was "unwilling to

continue working with [her] current parent coach." The report found: "It is a concern of this parent coach that after a total of 28 parent coaching sessions, [A.M.] has not made significant progress in adapting the skills covered in order to positively change her parenting style." The parent coach attached a letter documenting instances when A.M. missed or interfered with going forward with a parent coaching session and other reasons coaching sessions did not occur.

¶ 20     On July 24, 2019, the State filed a "Supplemental Petition for the Appointment of a Guardian with the Right to Consent to Adoption." The supplemental petition alleged respondent is unfit under the Juvenile Court Act because she has failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare; has failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minors from A.M. and/or to make reasonable progress toward the return of the minors; and that it was in the best interest of the minors that a guardian be appointed with the right to consent to the minors' adoption.

¶ 21     On September 9, 2019, the trial court entered a permanency order setting a permanency goal of substitute care pending court determination on termination of parental rights. The September 2019 order stated the minors are in a preadoptive home, want to remain with the current foster parents, and that A.M. had made no substantial progress.

¶ 22     On February 25, 2020, the minors' Guardian *ad Litem* (GAL) filed a "Motion to Clarify the Record." The GAL's motion stated that on January 29, 2020, the trial court conducted a family conference at which A.M. testified in open court that D.M. and J.M. "tell her all the time that the two want to come home to her and that the minors also tell [the caseworker] all the time that they want to come home to her." The GAL stated, on information and belief, that D.M. and J.M. "have never informed her that they want to return home to [A.M.]" The GAL further stated

that she visited the minors on November 16, 2019, D.M. and J.M. informed the GAL "that they both respectively wanted to stay with their foster parents," D.M. informed the GAL she did not want to return home to her mother," and J.M. told the GAL "that she did not know if she wanted to return home to her mother." Finally, the GAL stated that on October 18, 2019, Y.M. informed the GAL that Y.M. wants to stay with his foster parents and does not want to see A.M.

¶ 23    On September 10, 2020, the trial court entered a permanency order setting a permanency goal of substitute care pending a court determination on termination of parental rights because A.M. "has failed to correct the conditions that brought the case into care, the case is 5 years old, [there has been] no substantial progress by [A.M.,] the minor[s] [are] in a preadoptive home, *** want[] to remain with current foster parents, the minor[s] [are] in need of permanency, [and the] best interest of the minor[s] [is] for substitute care pending court determination on termination of parental rights."

¶ 24    The trial court set the matter for a termination trial.

¶ 25    At the termination trial, the trial court first took judicial notice of the February 10, 2017 adjudication and the February 21, 2017 dispositional hearing. The court also admitted into evidence A.M.'s service plans from July 24, 2015 until June 10, 2020.

¶ 26    Kyla Farquhar testified that she is employed by VOA, and that VOA assessed A.M. for services. VOA determined that A.M. needed services for domestic violence, victim services, individual therapy, parenting classes, parent coaching, and psychiatric medication monitoring. Farquhar testified A.M. completed several of the services; however, A.M. was discharged unsuccessfully from parent coaching. A.M. had taken 28 sessions of parent coaching before being discharged unsuccessfully whereas ten to fifteen sessions are normal for parent coaching. Farquhar also testified about A.M.'s visits with her children. Farquhar testified A.M. was not

getting visits in 2017 because A.M. was physically and verbally aggressive toward her caseworker. In 2019, A.M.'s visits were suspended only as to Y.M. Visitation with Y.M. was suspended because Y.M. told his therapist he did not feel safe seeing his mother. They visited virtually but before that Y.M. had not had visits with his mother since the beginning of 2019. In December 2019 A.M.'s visits with both D.M. and J.M. were suspended for approximately six months because D.M. and J.M. "reported fear during an incident that happened during a visit and expressed concern about future visits with mom."

¶ 27    Farquhar stated VOA had not staffed unsupervised visitation because, Farquhar opined, A.M. "had not shown the parenting skills that would allow her to leave the minors with [A.M.] safely and confidently." Farquhar further opined that A.M. had made "some" progress toward the goal to return the children home but VOA has never been able to move forward with unsupervised visits, which is the benchmark for determining that the services aimed at reunification are setting in for the parent. Farquhar testified on cross-examination that A.M. has another child with her in Indiana and Farquhar agreed that A.M. has parented that child well.

¶ 28    On April 20, 2021, following a continuance, respondent testified in the termination trial that in January 2016 she had a mental health assessment and as a result of that assessment she is not recommended to have any inpatient psychiatric treatment. A.M. testified that between November 2016 and August 2017 she successfully completed services for parenting classes, parent café coaching, and anger management at Knock At Midnight. A.M. further testified that in December 2016 she successfully completed a program titled "Taking Care of Yourself, Parenting Café" at Strong Families. Beginning in November 2016, until November 2017, A.M. attended Heartland Health Center Uptown to receive mental health treatment. In November 2017 A.M. had a second mental health assessment at Heartland Health and was told she was in good mental

health and no longer required psychotropic medication. A.M. received additional therapy at Crown Counseling Services between September 2017 and October 2017 but stopped when she moved. She also attended individual therapy at VOA from July 2016 until November 2018. Her last individual therapy session at VOA was in November 2018.

¶ 29    A.M. was diagnosed with Graves Disease—an autoimmune disease that causes the thyroid to "work overtime," mental confusion, and depression. A.M. was currently on medication for her Graves Disease. A.M. testified that she completed a parenting capacity assessment in November 2018. A.M. testified that at that time she was concerned that Y.M. was being coached because Y.M. had suddenly stopped calling her mom and sitting in her lap to saying he hated A.M. and hated coming to see her. A.M. testified she received parenting coaching at VOA from December 2017 until January 2019. A.M. had a psychological assessment in April 2019 at Friend, Family Health Center.

¶ 30    A.M. testified she had always tried to cooperate with the services requested of her and that she continued to engage in services after the goal was changed in her case. A.M. moved to Indiana in July 2016. A.M. took parenting classes at the Indiana Parenting Institute beginning in 2018 until March 2021. She testified she was also receiving parenting coaching and therapy in Indiana. After she moved she continued to visit with her children and continued to engage in the services requested of her. Before December 2019, A.M. had two unsupervised visits with all of the minors and she felt they went well. Jenae Bellezza, A.M.'s service provider at the Indiana Parenting Institute, testified that A.M. had been engaged in their program at Village of Hope, where A.M. was residing. That program is a support group in which parenting skills are taught and they discuss issues and form solutions.

¶ 31     During the best interest portion of the proceedings A.M. testified that VOA did not respect her wishes, were disrespectful, and rude. She described her caseworkers as "evil." Her requests as to where she wanted her children placed when they were removed from her custody were ignored. A.M. testified she tried her hardest to make every therapy appointment, parent coaching, and every visit.

¶ 32     The foster parents for D.M. and J.M., and the foster parents for Y.M., also testified in the best interest portion of the hearing. The foster parents testified as to their relationship with the minors and their desire to adopt them.

¶ 33     On April 20, 2021, the trial court entered a "Termination Hearing Order." The trial court's order finds that the minors were found neglected or abused in February 2017, made wards of the court on February 21, 2017, and that A.M. is unfit specifically because of A.M.'s "failure to make reasonable progress during the time frames of November 11, 2017 to August 10, 2018, and May 12, 2019 to February 11, 2020. The order finds that it is in the best interest of the minors to terminate A.M.'s parental rights. The court also entered a permanency order with a goal of adoption.

¶ 34     This appeal followed.

¶ 35                                    ANALYSIS

¶ 36     Before the trial court may terminate parental rights it must first find that the parent is unfit. *In re M.M.*, 156 Ill. 2d 53, 61 (1993). "Upon a finding of unfitness, it must then determine whether the termination of a parent's rights is in the best interest of the minor." *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). A.M. is self-represented in this appeal. Based on our review of A.M.'s *pro se* brief we find A.M. seeks to assert the following viable arguments regarding the trial court's judgment: (1) the judgment is against the manifest weight of the evidence because

the State failed to provide her with proper services for the return of the minors after she moved to Indiana, became pregnant, and where the agency providing services (VOA) mistreated her; and (2) the decision is against the manifest weight of the evidence where the trial court erroneously relied on her being late to two appointments, the court ignored evidence Y.M. was coached, and A.M. is employed, has housing, and is in therapy. A.M. also claims that during the termination trial she was not allowed to cross-examine her caseworker and that she was prejudiced by a late change in the trial judge deciding her case. However, A.M. was represented by counsel and the record reflects that her attorney did cross-examine the witness; furthermore, nothing in the record suggests the trial judge presiding over the termination trial was not familiar with the case. To the contrary, the trial judge's oral rulings demonstrate great understanding of the facts of the case and great care toward considering those facts and A.M.'s circumstances.

¶ 37     This court reviews the trial court's finding of unfitness under the manifest weight of the evidence standard. *In re R.L.*, 352 Ill. App. 3d at 998. Further, this court reviews the trial court's determination that it is in the best interest of the child to terminate parental rights under the manifest weight of the evidence standard. *In re J.V.*, 2018 IL App (1st) 171766, ¶ 164. The trial court's determinations are against the manifest weight of the evidence only where the opposite conclusion is "clearly evident" or the trial court's determination is unreasonable, arbitrary, or not based on the evidence presented. *Id*. When this court reviews a decision under the manifest weight of the evidence standard, it is not enough to reverse the trial court's determination that this court might have reached a different conclusion. See *O'Boyle v. Personnel Board of the City of Chicago*, 119 Ill. App. 3d 648, 653 (1983). The opposite conclusion is "clearly evident" when " 'all reasonable and unbiased persons, acting within the limits prescribed by the law and

drawing all inferences in support of the finding, would agree that the finding is erroneous,' [citation], and *** the opposite conclusion is clearly evident. [Citation.]" *Id.*

¶ 38    The State has the burden to prove that a parent is unfit with clear and convincing evidence. *In re N.F.*, 2020 IL App (1st) 182427, ¶ 39.

> "A parent's failure to make 'reasonable progress' toward the return of their child can support a finding of unfitness. [Citations.] Reasonable progress is an objective standard that requires, at a minimum, 'measurable or demonstrable movement' toward reunification. [Citation.] A parent's compliance with service plans and court directives is the benchmark for measuring reasonable progress. [Citation.]" *Id.*

¶ 39    Moreover, "[t]he State must prove by a preponderance of the evidence that it is in the child's best interest that the parental rights be terminated." *In re R.L.*, 352 Ill. App. 3d at 1001. The court considers the following factors to determine the child's best interest: "the child's physical safety and welfare; the development of the child's identity; the child's familial, cultural, and religious background; the child's sense of attachment, including love, security, familiarity, *** continuity of relationships with parent figures and other relatives; the uniqueness of every family and child; the risks related to substitute care; and the preferences of the person available to care for the child. [Citations.]" *Id.*

¶ 40    We find the trial court's judgments finding A.M. unfit, terminating A.M.'s parental rights, and finding adoption is in the minors' best interest, are not against the manifest weight of the evidence. Following the termination trial the trial court found that A.M. made reasonable efforts during the time period February 2017 to November 2017. The court's pronouncements also suggest it found A.M. made reasonable efforts during the "final" period from May 2019

until February 2020. The court found that, during the "middle" period of November 11, 2017 until August 10, 2018, none of A.M.'s evidence shows A.M. "to even be engaged in services. The only thing she was engaged [in] during that period was the therapy at [VOA,] and the parenting coaching, both of which were troubling." The court noted A.M. attended 28 weeks of parenting coaching when the average is five to ten, but "there was still not sufficient progress made." The court also noted that it was during this period that A.M. twice (once in 2017 and again in 2019) got into a verbal altercation with the caseworker during a supervised visitation, after which A.M.'s visitation was suspended for six months.

¶ 41    The trial court found there was "no question" that A.M. "has made efforts over the life of this case." However, the court found, five years have elapsed since the children were taken into custody and A.M. "doesn't even have unsupervised visits because despite all of the services that she has engaged in, she has really never made reasonable progress." The court found A.M. had failed to make reasonable progress "both on the second and third period of time in the State's *** petition." The court concluded: "We are still at supervised visits over five years later. The kids are entitled to permanency. I can't have them hanging in the foster care system until they age out. It's not fair to them." The court ruled the State had met it burden to prove by clear and convincing evidence that A.M. had failed to make reasonable progress toward the return of the children within nine months after the adjudication "and for really all three of the time periods."

¶ 42    We find that all of the trial court's findings are reasonable and based on the evidence presented. We cannot say that all reasonable persons applying the law to this case would agree that the trial court's finding is erroneous. See *O'Boyle*, 119 Ill. App. 3d at 653. To the contrary, the evidence established that A.M. failed to comply with service plans, which is "the benchmark for measuring reasonable progress" (*In re N.F.*, 2020 IL App (1st) 182427, ¶ 39), by, for

example, failing to participate in or frustrating individual therapy, failing to successfully complete parent coaching by abiding to her own parenting style, or by her inability or refusal to control her behavior during visitations. Moreover, as the trial court correctly noted, after several years of services A.M. still had not progressed to unsupervised visitation. Therefore, the evidence is clear and convincing that, objectively, she had not made "demonstrable movement" toward reunification. *Id.*

¶ 43 Additionally, the trial court's judgment that adoption is in the minors' best interest is not against the manifest weight of the evidence. The evidence established that Y.M. had been in his placement since October 2016 and D.M. and J.M. had been in their placement since November 2018. Both sets of foster parents wished to adopt the minors. Both testified the minors have become a part of their family. The trial court also heard evidence that the minors had expressed a desire to remain with their foster families. The caseworker for A.M. testified the minors were doing well in their foster homes and opined that "due to the length of time that the minors have been in care, their own desire that they have shared with the agency, and the agency's inability to move forward with unsupervised visits and overnight visits, the agency at this time feels that's in their best interest *** for parental rights to be terminated."

¶ 44 We find that the trial court's judgment that adoption is in the minors' best interest considers the minors' physical safety and welfare and sense of attachment, especially security, familiarity, and continuity of relationships with parent figures—in this case their foster parents. See *In re R.L.*, 352 Ill. App. 3d at 1001. The opposite conclusion is not clearly evident.

¶ 45 A.M. argues on appeal that she was not provided with transportation to participate in services after she moved to Indiana. However, we find no requirement for the provision of transportation to the parent. We also note A.M. was able to participate in services in Illinois after

- 15 -

she moved, so there is nothing to suggest her move caused an inability to participate in services. A.M. also argues that not enough consideration was given to the fact she was in a high risk pregnancy during some of the service periods. However, A.M. has not said, nor can we determine, how her services could or should have been altered to accommodate her pregnancy beyond the ability, which she had, to schedule and reschedule appointments as needed.

¶ 46 A.M. claims VOA mistreated her because it failed to consider her wishes as to the minors' placement when the State removed the minors from A.M.'s custody. However, we find nothing that provides that the State *must* follow or consider the parents' preferences for placement when minor children are removed from their custody. See 705 ILCS 405/2-7 (West 2014) (Temporary Custody); 705 ILCS 405/2-27 (West 2014) (Placement; legal custody or guardianship). Nor does the record contain a motion to modify a temporary custody order. See 705 ILCS 405/2-10(9)(c) (West 2014) ("any interested party *** may file a motion that it is in the best interests of the minor to modify or vacate a temporary custody order on *** the following grounds: *** (c) A person not a party to the alleged abuse, neglect or dependency, including a *** relative *** is capable of assuming temporary custody of the minor").

¶ 47 Finally, the evidence at the trial rebutted A.M.'s suggestion Y.M. was coached to say he did not want to visit or was afraid of A.M. The record is also clear that the trial court did not simply rely on A.M. being late to two appointments nor did the court fail to consider her employment, housing, and the therapy she was receiving. The trial court specifically commented: "[S]he also re-engaged in services again, community coaching and parenting education from December of 2019 to July of 2020." The court also stated it had no doubt that A.M. "is interested in her kids and is concerned about her kids. There is no question in my mind that she has made efforts over the life of this case." Nonetheless, the court based its determination on the fact that

after five years A.M. still had not made reasonable progress toward the return of the minors. That fact is established by, among other evidence, A.M.'s inability to complete parent coaching or to progress to unsupervised and overnight visitation.

¶ 48    We cannot say the trial court's judgment is arbitrary, unreasonable, not based on the evidence, or that the opposite conclusion is clearly evident. The State met its burden to prove by clear and convincing evidence that A.M. is "unfit" due to her failure to make reasonable progress toward reunification and the State met its burden to prove by a preponderance of the evidence that it is in the minors' best interest that A.M.'s parental rights be terminated. The trial court's judgments are not against the manifest weight of the evidence where the judgment is not arbitrary because it is based on the evidence presented nor is it unreasonable because the minors have been in their current foster placements for significant time and are thriving in them. Viewing the evidence we cannot say the opposite conclusion is clearly evident in this case.

¶ 49                                    CONCLUSION

¶ 50    For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 51    Affirmed.